## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| STACY W., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | No. 19 C 5988 |
| v. | ) | |
| | ) | **Magistrate Judge Gabriel A. Fuentes** |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Stacy W.,[3] applied for Disability Insurance Benefits ("DIB") in October 2015, alleging a disability onset date of June 22, 2011 (R. 189), which was amended to July 1, 2015. (R. 36.) Plaintiff's date last insured ("DLI") was December 31, 2015. (R. 16.) On September 26, 2018, an Administrative Law Judge ("ALJ") issued an opinion finding Plaintiff not disabled. The Appeals Council denied review (R. 1), making the ALJ's decision the final decision of the

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On October 28, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 8.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court abides by IOP 22 subject to the Court's stated concerns.

Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021). Before the Court are Plaintiff's motion seeking remand of that decision (D.E. 15) and the Commissioner's cross-motion to affirm. (D.E. 17.)

## BACKGROUND

### I.     Administrative Record

In June 2011, four years before her alleged onset date, Plaintiff was admitted to the emergency department ("ED") of a local hospital after a drug overdose; she went home the next day with diagnoses of anxiety and substance abuse disorders. (R. 320-22.) In December 2011, Plaintiff was brought to the ED passed out after displaying an altered mental state either due to substance abuse or possible seizure. (R. 347-48, 661-62.) The record continues in May 2014, when Plaintiff was brought to the ED after showing an altered mental state and appearing unresponsive in a taxi; she was diagnosed with alcohol intoxication. (R. 439-41.) In June 2014, Plaintiff was again brought to the ED due to an altered mental state after a possible drug overdose; she denied using drugs, but her urine was positive for amphetamines. (R. 451-55.)

Next, on July 9, 2015, just after her alleged onset date, Plaintiff went to a walk-in clinic to report "being epileptic." (R. 525.) She related that her friend noticed an episode where Plaintiff had a "blank stare," and Plaintiff claimed to "have been diagnosed with petite mal seizures;" her depression and anxiety screening was negative. (R. 525-26.)  Plaintiff reported that she last took medications in 2012 (Xanax, gabapentin and phenobarbital).[4] (R. 526.)

---

[4]     Xanax (alprazolam) is used to treat anxiety disorders and panic disorder. https://medlineplus.gov/druginfo/meds/a684001.html. Gabapentin is used to help control certain types of seizures in people who have epilepsy. https://medlineplus.gov/druginfo/meds/a694007.html. Phenobarbital is used to control seizures, relieve anxiety and/or prevent withdrawal symptoms. *See* https://medlineplus.gov/druginfo/meds/a682007.html.

On July 28, 2015, Plaintiff began treatment with psychiatrist Kristin Moore, M.D.; Plaintiff had no prior consistent psychiatric care. (R. 522.) Dr. Moore assessed Plaintiff with anxiety disorder and polysubstance dependence in remission and prescribed Plaintiff Prozac and hydroxyzine.[5] (R. 522-23.)

On August 7, 2015, Plaintiff underwent an electroencephalogram ("EEG") to measure the electrical activity in her brain; it showed "mild generalized slow wave abnormality." (R. 671.) On August 13, Advanced Practice Nurse ("APN") Suzette Rush-Drake gave her a referral for a seizure consultation with neurologist Myron Glassenberg, M.D., to review the EEG. (R. 519-21.) Plaintiff also complained of a flu bug and "back pain." (*Id*.) On August 25, Plaintiff told Dr. Moore she was feeling more anxious, worried and tired, and her mood appeared anxious; Dr. Moore discontinued Prozac and prescribed Effexor and hydroxyzine.[6] (R. 513-14.)

On September 25, 2015, Plaintiff met with Dr. Glassenberg. She reported that her friend in July witnessed that she "stopped in the middle of conversation and got sweaty, had dark blurry vision, and stopped and stared into space for about 20 seconds and dropped what she was holding." (R. 574.) Plaintiff believed she had experienced additional episodes that were unwitnessed; she reported that her first seizure was in 2012 due to withdrawal from Xanax. (*Id*.) Dr. Glassenberg noted that the EEG "only showed some nonspecific slowing and no sharp waves." (*Id*.) On examination, Plaintiff was fidgeting and had diminished upper extremity reflexes bilaterally. (R. 575-76.) Plaintiff did not want any medications. (R. 576.)

---

[5] Prozac (fluoxetine) is used to treat depression, obsessive-compulsive disorder, and panic attacks. https://medlineplus.gov/druginfo/meds/a689006.html. Hydroxyzine is used to relieve anxiety and tension. https://medlineplus.gov/druginfo/meds/a682866.html.

[6] Effexor (venlafaxine) is used to treat depression and can also used to treat generalized anxiety disorder, social anxiety disorder and panic disorder. https://medlineplus.gov/druginfo/meds/a694020.html.

On October 27, 2015, Dr. Moore noted that Dr. Glassenberg found "no evidence for seizure on EEG." (R. 499.) On examination, Plaintiff's mood and anxiety were improved; she reported feeling more calm, levelheaded, focused and productive. (*Id.*) Dr. Moore increased Plaintiff's dose of Effexor and noted that Plaintiff had not yet followed up on her referral for therapy because she felt it was not needed. (R. 501.) The next month, on November 24, 2015, Plaintiff followed up with Dr. Moore. Plaintiff reported sleeping a little better; her anxiety was stable but her mood was sad because she was dreading being excluded by her family during the holidays. (R. 495-96.) Plaintiff did not tolerate the higher dose of Effexor, so Dr. Moore decreased the dose. (*Id.*)

The remaining documents in the record post-date Plaintiff's DLI. On February 5, 2016, Plaintiff followed up with Dr. Glassenberg. Her neurological examination was normal, and Dr. Glassenberg assessed her with "atypical absence seizure."[7] (R. 566-67.) A follow-up EEG in May 2016 was "[m]ildly abnormal" and "could be compatible with a seizure disorder." (R. 668.)

On March 27, 2016, Plaintiff filled out a function report. She reported that she lived alone, and her daily chores included cleaning, laundry, vacuuming/mopping, household repairs and dishes, but it took her 1.5 hours to vacuum/mop, three hours to do the laundry and two hours to do the dishes because she had "several seizures a day that prevent [her] from completing small shores & tasks in a timely manner." (R. 243-45.) Plaintiff used public transportation, walked or rode her bicycle to go to the laundromat and to go shopping for groceries, personal care products, pet supplies, household items and clothes, which she did a couple times a week, for two to five hours. (R. 246-47.) Her hobbies included reading, trivia games, gardening, bike riding, yoga, meditation and volunteering at an animal shelter. (R. 247.) She socialized with others but went out less

---

[7] "An absence seizure is the term for a type of seizure involving staring spells. This type of seizure is a brief (usually less than 15 seconds) disturbance of brain function due to abnormal electrical activity in the brain." https://medlineplus.gov/ency/article/000696.htm.

because she was tired from her daily activities. (R. 247-48.) She no longer used the stove for fear of having a seizure while cooking. (R. 250.)

In May 2016, non-examining state agency consultants opined as to Plaintiff's physical and mental impairments. Plaintiff's severe impairments were found to be minor motor seizures, affective disorders and substance addiction disorders. (R. 87.) With regard to her mental impairment, Plaintiff was found to have mild restriction in activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. (*Id*.) The state agency consultant opined that Plaintiff had the mental residual functional capacity ("RFC") "to understand, remember and concentrate sufficiently in order to carry out one and two-step instructions/tasks and to sustain efforts for a normal work period," "make simple work-related decisions," "interact and communicate with others sufficiently in a work setting" and "adapt to routine changes and pressures in the work environment." (R. 93.) Plaintiff was given a physical RFC with no limits except to never climb ladders, ropes or scaffolds and to avoid concentrated exposure to hazards. (R. 90-91, 94.) Both RFC assessments were affirmed on reconsideration in December 2016. (R. 103-04, 106-07.)

Plaintiff returned to Dr. Glassenberg on September 1, 2016. She reported having had a seizure; her neurological exam showed some restlessness but was otherwise normal. (R. 618.) Dr. Glassenberg started Plaintiff on Lamictal.[8] Dr. Glassenberg's follow-up examination on September 23 was also normal; Plaintiff had no idea if Lamictal decreased her absence seizures because she lived alone. (R. 616.) On October 31, Plaintiff reported having had 13 episodes; although her neurological exam was normal, Dr. Glassenberg increased Plaintiff's dosage of Lamictal and Effexor; he described Plaintiff's impairment as "complex partial seizure disorder."

---

[8] Lamictal (lamotrigine) is used to treat certain types of seizures in patients who have epilepsy. https://medlineplus.gov/druginfo/meds/a695007.html.

5

(R. 614.) Dr. Glassenberg also noted that Plaintiff was feeling sad, depressed and extremely stressed. (*Id*.) On December 1, 2016, Plaintiff APN Sharon Hayes recorded Plaintiff's mood and affect as "manicy, laughing inappropriately," and a screening for generalized anxiety disorder indicated that her functional impairment was "very difficult" and that she had "severe anxiety." (R. 707-09.)

Records from 2017 centered on physical complaints. In April 2017, Plaintiff complained of low back pain radiating down to her buttocks (R. 627.) In June 2017, Plaintiff was taken to the ED after being found unresponsive in a park; her attending doctor's "clinical impression [was] hypoglycemia, amphetamine use." (R. 641-42.) In July, she reported worsening back pain, and imaging showed degenerative disc disease with mild herniation and arthropathy at L5-S1, for which Plaintiff received an injection. (R. 771-74, 782.) In November, EEG findings indicated moderate global encephalopathy of nonspecific etiology.[9] (R. 666.)

In 2018, Plaintiff obtained medical opinions from her treatment providers. In March 2018, Dr. Glassenberg completed a "Seizure Questionnaire," in which he wrote that despite compliance with medication, Plaintiff had several seizures a week where she lost consciousness for one minute, resulting in mental/physical exhaustion, inability to think clearly and decreased verbal and motor skills. (R. 679-80.) In June 2018, Plaintiff obtained an opinion from psychiatric physician's assistant ("PA") Anna Hereth. PA Hereth wrote that she had treated Plaintiff since February 2017, and she agreed with Plaintiff's claim that she could not work after June 2011. (R. 807.)[10] PA

---

[9] "Encephalopathy is a term for any diffuse disease of the brain that alters brain function or structure. . . . The hallmark of encephalopathy is an altered mental state." https://www.ninds.nih.gov/Disorders/All-Disorders/Encephalopathy-Information-Page.

[10] PA Hereth also noted that Plaintiff had a "GAF" (Global Assessment of Functioning) score of 40. (R. 807.) "The GAF is a 100-point metric formerly used to rate overall psychological, social, and occupational functioning." *Cullinan v. Berryhill*, 878 F.3d 598, 601 n.1 (7th Cir. 2017) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM IV") 32–34 (4th ed., Text Rev. 2000)). A

Hereth opined that Plaintiff's generalized anxiety disorder and major depression, which led to "great difficulty with concentration and sustained attentiveness," would cause her to be off task more than 30 percent of an eight-hour work day. (R. 808-10.) Also in June 2018, licensed clinical social worker ("LSW") Jane Flotte, after treating Plaintiff for four weeks, opined that Plaintiff had unspecified bipolar disorder, which markedly limited her ability to function. (R. 813-15.)

## II.   Evidentiary Hearing Before the ALJ

At her hearing on June 18, 2018, Plaintiff testified that in 2015 she had epileptic seizures three to four times a day, lasting about 15 minutes, and she had constant lower back pain in 2015. (R. 47-48, 50-51.) Plaintiff stated that she lived alone and did some housecleaning for friends, but housework like cooking and grocery shopping took her most of day due to her impairments. (R. 54-56.) Plaintiff denied that her seizures in 2015 were from drug withdrawal or using illegal drugs, and she opined that a June 2017 hospital drug screen had given her a false positive for amphetamine. (R. 63-64.)

The ALJ asked Plaintiff why Dr. Glassenberg indicated in his notes in 2015 that she had only had a few seizures and why Plaintiff declined anti-seizure medication in September 2015. (R. 61.) Plaintiff did not recall declining medication and assumed Dr. Glassenberg misunderstood the frequency of her seizures. (R. 61-62.) The ALJ also asked why the record copy of Dr. Glassenberg's 2018 opinion had answers that were whited out and different sets of handwriting. (R. 78.) Plaintiff said she asked the doctor's office to add details to the report. (R. 80.)

---

GAF score of 40 would have signaled "severely" impaired functioning. *Crump v. Saul*, 932 F.3d 567, 568 (7th Cir. 2019) (citing DSM IV at 34). "The American Psychiatric Association eliminated use of the GAF in 2013, . . . citing a 'conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Lanigan v. Berryhill*, 865 F.3d 558, 561 n.1 (7th Cir. 2017) (citing DSM 16 (5th ed. 2013)). *See also Felts v. Saul*, 797 F. App'x 266, 269 (7th Cir. 2019) ("GAF scores do not reflect the clinician's opinion of functional capacity because they measure and reflect the worse of the severity of symptoms and functional level") (internal quotations and citations omitted).

The ALJ presented the vocational expert ("VE") with a hypothetical individual who could perform the full exertional range of work; had to avoid climbing ladders/ropes/scaffolds, unprotected heights, moving dangerous machinery, and driving; and was limited to learning, understanding, remembering and carrying out simple work instructions; making simple, work-related decisions; responding appropriately to routine changes and pressures in the work environment; and sustaining concentration, persistence, and pace for two-hour increments in an eight-hour workday. (R. 72.) The VE opined that individual could not perform Plaintiff's past work as a personnel recruiter or bank teller, but could perform medium unskilled work. (*Id.*)

## III.     ALJ's Decision

On September 26, 2018, the ALJ issued an opinion finding Plaintiff was not disabled from her alleged onset date of July 1, 2015, through her DLI of December 31, 2015. (R. 16.) The ALJ found Plaintiff had the severe impairments of epileptic seizure disorder and anxiety disorder but that there was no "objective evidence" of Plaintiff's alleged lower back pain during the relevant time period. (R. 18.) The ALJ found Listing 11.02 (epilepsy) was not met "because the objective record lacks a documented and detailed description of a typical seizure afflicting the claimant," and "does not indicate that her seizure disorder met the requisite number and frequency of seizures." (R. 19.) The ALJ also found Plaintiff's mental impairment did not meet Listing 12.06 during the period at issue because she had only moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. (R. 19-20.)

The ALJ reviewed Plaintiff's testimony and function report, and determined that her statements concerning the intensity, persistence and limiting effects of her alleged symptoms from her impairments were inconsistent with her testimony and the objective medical evidence from the

relevant time frame. (R. 21.) The ALJ acknowledged Plaintiff's testimony that she "generally" had difficulty remembering, following instructions, completing tasks, concentrating, focusing, engaging in social activities, spending time in crowds, handling change and managing her mood. (R. 19-20.) However, the ALJ found that testimony inconsistent with Plaintiff's stated ability to "perform simple maintenance, prepare meals, go to doctors' appointments, take medications, ride a bicycle, take public transportation, shop," "perform light cleaning," "get along with others," "manage funds," "handle self-care and personal hygiene, care for pets, and get along with caregivers," and inconsistent with Plaintiff's stated "hobbies and interests includ[ing] reading, playing trivia games, gardening, bike riding, yoga, meditation and volunteering at the tree house shelter." (R. 19-20, 24.)

The ALJ also found Plaintiff's allegations of disabling limitations to be inconsistent with: (1) reports from Dr. Glassenberg, Dr. Moore and the ED "show[ing] mostly stable conditions and conservative management of the symptoms" (R. 22-23); and (2) Plaintiff's demonstrated ability to "provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatment . . . , [] respond to questions from medical providers," "get[] along well with providers and staff" and maintain "appropriate grooming and hygiene." (R. 19-22.) The ALJ assigned Plaintiff the same RFC she offered in the hypothetical to the VE: a full range of work at all exertional levels but with the certain nonexertional mental and physical limitations. (R. 20.) The ALJ recognized Plaintiff "may have experienced some limitation of activity due to her physical and mental impairments during the period at issue," but determined that the RFC adequately accounted for her "distractibility from her anxiety disorder as well as her epileptic condition." (R. 22, 26.)

The ALJ gave great weight to the mental and physical RFC opinions of the non-examining state agency consultants because: (1) they were consistent with "the record as a whole," which indicated that "during the period at issue," Plaintiff's anxiety disorder was "well controlled with prescribed treatment methods," and the symptoms from her "physical impairment . . . were stable and relatively well controlled with prescribed treatment methods;" (2) Plaintiff's ADLs during the period at issue showed that the symptoms from her anxiety disorder "were well controlled," and the symptoms from her physical impairments "were well controlled and tolerable;" and (3) the state agency consultants were medical professionals with knowledge of the Social Security regulations and their evidentiary requirements. (R. 24-25.)

The ALJ gave little weight to Dr. Glassenberg's opinion, finding it was "not relevant to the period at issue," as it "address[ed Plaintiff's] seizure disorder as of March 2018 and does not relate back to [her] condition prior to and through her date last insured. The record indicates that the claimant's seizure disorder was well controlled and tolerable during the period at issue." (R. 25.) The ALJ also gave PA Hereth's opinion little weight because it was "not relevant to the period at issue" as "she began treating [Plaintiff] in February 2017," after Plaintiff's DLI, and a PA was "not an acceptable medical source under the regulations." (*Id.*)[11]

Ultimately, the ALJ found Plaintiff could not perform her past relevant work between July 1, 2015, and December 31, 2015, but that a significant number of jobs existed that she could have performed, and therefore, that she was not disabled during that time. (R. 26-28.)

### ANALYSIS

As Plaintiff recognizes, "the ALJ's theory in denying benefits centers primarily upon a lack of evidence during the relevant period." (D.E. 16: Pl.'s Mem. at 7.) The relevant period here is a

---

[11] The ALJ also assigned little weight to Plaintiff's GAF score because, among other things, GAF scores "are no longer recognized by the medical community in the DSM V." (R. 25.)

narrow six-month window: from Plaintiff's alleged onset date of July 1, 2015, to her DLI of December 31, 2015. To obtain benefits, Plaintiff must establish that she became disabled before her DLI, *Kaplarevic v. Saul*, 3 F.4th 940, 942 (7th Cir. 2021), meaning "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of no less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). Despite the narrow time frame, Plaintiff contends that the ALJ made errors in her opinion that require remand. We discuss Plaintiff's arguments below.

## I.       Legal Standard

An ALJ's decision will be affirmed if it was supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. In making this determination, "[w]e will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal quotations omitted).

## II.      The ALJ's Assessment of Plaintiff's Limitations from her Mental Impairments Was Supported by Substantial Evidence.

Plaintiff claims that the ALJ's RFC assessment did not incorporate all her mental health limitations supported by the record; in support of this claim, Plaintiff cites only to evidence that post-dates her DLI by one to three years. (Pl.'s Mem. at 10-12, citing opinions from PA Hereth, LSW Flotte, Dr. Glassenberg and the December 2016 anxiety screening.) Plaintiff speculates that "[i]t is inconceivable that an individual who not only suffers from severe anxiety, but also suffers

11

from severe epileptic seizure disorder . . . would be able to function as the ALJ suggested on a full time basis." (*Id*. at 11.) The Court disagrees.

The ALJ's decision not to adopt the limitations in the 2018 medical opinions was supported by substantial evidence. As the Court discusses further below, the ALJ properly explained that the opinions did not relate back to the relevant time period in 2015. Plaintiff's speculation that her later symptoms must have limited her years earlier does not undermine the ALJ's opinion because Plaintiff "bears the burden to prove she is disabled by producing medical evidence. Yet she failed to show how her medically determinable impairments caused any limitations beyond those the ALJ found." *Gedatus*, 994 F.3d at 905 (internal citations omitted). In the absence of evidence showing Plaintiff's functional limitations began to be disabling in 2015, the ALJ reasonably relied on the opinions of the state agency physicians in assessing Plaintiff's mental RFC. *See Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021) (holding that ALJ's reliance on the state agency medical opinions was permissible where the claimant failed to present evidence of his limitations).[12]

### III.    The ALJ's Credibility Determination Was Supported by Substantial Evidence.

Plaintiff also contends that the ALJ's determination that her testimony was inconsistent with the record was erroneous because the ALJ improperly equated her ability to perform certain

---

[12] Later in her brief, Plaintiff takes issue with the fact that non-examining state agency doctors found only "mild" limitations in social functioning while the ALJ found "moderate" limitations. (Pl.'s Mem. at 14-15.) This descriptive difference was harmless because the mental limitations in the RFC assigned by the ALJ closely tracked the state agency RFC opinions, and Plaintiff cited no evidence of greater limitations nor hypothesized any additional work restrictions that she had during the relevant time period. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (holding that any error in the ALJ's RFC assessment was harmless because "[i]t is unclear what kinds of work restrictions might address [the claimant's] limitations in concentration, persistence, or pace, because he hypothesizes none.")

ADLs with the ability to work full time. (Pl.'s Mem. at 13-14.)[13] Again, the Court disagrees and sees the ALJ's credibility judgment as supported by substantial evidence.

"As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, -- F.4th --, 2022 WL 663274, at *4 (7th Cir. Mar. 7, 2022). Here, the ALJ adequately explained that Plaintiff's testimony that she had difficulty remembering, following instructions, completing tasks, engaging in social activities, concentrating and focusing was not consistent with her testimony that she lived independently, which included independently performing simple maintenance and meals, caring for herself and her pets, performing light cleaning, shopping and taking public transportation. (R. 19, 20-24.) "[T]he ALJ did not improperly equate [Plaintiff's] daily activities with the activities of full-time work." *Penrod on behalf of Penrod v. Berryhill*, 900 F.3d 474, 478 (7th Cir. 2018).

Plaintiff also claims that the ALJ's reliance "upon an absence of 'witnessed' [seizure] episodes" was improper because she lived alone, so no one was there to witness her seizures. (Pl.'s Mem. at 13.) However, the ALJ explained that she found Plaintiff's testimony inconsistent with the record evidence *because* Plaintiff lived and took care of her needs independently. The ALJ's decision to discount Plaintiff's testimony based on her ADLs was supported by substantial evidence.

---

[13] Plaintiff also states that "the ALJ gratuitously devoted much discussion to substance problems, prior to the amended onset date, to undermine epileptic symptoms" and suggests that this discussion was a basis for the ALJ's credibility determination. (Pl.'s Mem. at 13.) The Court disagrees that the ALJ's discussion of Plaintiff's substance abuse was "gratuitous," as it came up multiple times in the medical record in relation to Plaintiff's visits to the ED. Regardless, the ALJ gave no indication in the opinion that she relied on Plaintiff's history of substance abuse in determining Plaintiff's credibility.

IV.     **The ALJ's Assessment of the Medical Opinions in the Record Was Supported by Substantial Evidence.**

Finally, Plaintiff contends that the ALJ's decision to give little weight to the opinions of Dr. Glassenberg and PA Hereth and great weight to the opinions of the state agency physicians was not supported by substantial evidence. For claims filed before March 27, 2017, as Plaintiff's claim was, a treating physician's opinion is entitled "to controlling weight unless the ALJ provided 'good reasons' for affording it less weight." *Pavlicek*, 994 F.3d at 781 (citing 20 C.F.R. § 404.1527(c)(2)). Section 404.1527(c)(2) states that if the ALJ does not give a treating source's medical opinion controlling weight, the ALJ will consider the following factors in deciding what weight to give the opinion: frequency and extent of examining relationship; length, nature and extent of treatment relationship, the supportability and consistency of the medical opinion with the record; and the treating source's specialization.

Here, the ALJ explained that she gave little weight to the RFC opinions of Dr. Glassenberg and PA Hereth because they were "not relevant to the period at issue." (R. 25.) Because Plaintiff was required to establish that she became disabled before her DLI to qualify for benefits, the relevant time period was from her alleged disability onset date of July 1, 2015, to her DLI of December 31, 2015. *McHenry v. Berryhill*, 911 F.3d 866, 869 (7th Cir. 2018). The ALJ explained that Dr. Glassenberg's opinion "address[ed Plaintiff's] seizure disorder as of March 2018 and d[id] not relate back to [her] condition prior to and through her date last insured," and PA Hereth only "began treating [Plaintiff] in February 2017," despite her opinion purporting to address Plaintiff's condition since 2011. (R. 25.) The ALJ did not explicitly consider each of the Section 404.1527(c)(2) factors, and Plaintiff contends that this omission requires remand.

"As a general rule, an ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to treating physicians' opinions." *Karr v.*

*Saul*, 989 F.3d 508, 512 (7th Cir. 2021) (internal citations and quotations omitted). However, if the reviewing court is "convinced that the ALJ would reach the same result on remand," then an ALJ's failure to address each of the Section 404.1527(c)(2) factors "is harmless and a remand is not required." *Id.* at 513. In *Karr*, the Seventh Circuit held that the ALJ's failure to "march[] through the factors referenced in § 404.1527(c)(2)" was harmless error because "the ALJ stood on firm ground in finding the opinion . . . at odds with the weight of the other medical evidence." *Id*. at 512-13. The ALJ stood on firm ground here, too, in deciding to give little weight to the opinions of Dr. Glassenberg and PA Hereth. Despite not "marching through the factors referenced in § 404.1527(c)(2)," *id*., the ALJ's explanation as to why their opinions were not relevant to the period at issue constituted substantial evidence – or "good reasons," as the Seventh Circuit put it in *Pavlicek*, 994 F.3d at 781 – that has left the Court "convinced that the ALJ would reach the same result on remand" such that the ALJ's failure to address each of the Section 404.1527(c)(2) factors was "harmless and a remand is not required." *Karr*, 989 F.3d at 512-13.

Plaintiff's arguments to the contrary fall flat. Plaintiff states that it was "absurd" for the ALJ to find Dr. Glassenberg's opinion irrelevant to the period at issue because he "treated Plaintiff consistently since the alleged onset date, and there is no indication that there has been a change in Plaintiff's seizure activity since then, whether for better or for worse." (Pl.'s Mem. at 15.) Plaintiff's argument seems to be that because Dr. Glassenberg opined that Plaintiff's seizures may have been disabling in March 2018, "they must have been disabling in [2015]. This argument is both illogical and inconsistent with the record" where, as the ALJ found here, the symptoms Plaintiff had during the relevant time period were mostly stable with conservative management. *Penrod on behalf of Penrod v. Berryhill*, 900 F.3d 474, 477-78 (7th Cir. 2018) (rejecting the claimant's argument that because her husband's heart problems "proved fatal in 2015 they must

have been disabling in 2012 and 2013"). Moreover, despite treating Plaintiff since September 2015, the ALJ was correct that Dr. Glassenberg's 2018 opinion did not offer a retrospective view on Plaintiff's functional limitations before her DLI. He opined on Plaintiff's limitations as of the date of the opinion, more than two years after Plaintiff's DLI. Plaintiff's claim that there was "no indication" about changes in her seizure activity over the years does not negate the ALJ's opinion because the absence of evidence of Plaintiff's seizures "amounts to a failure of proof on Plaintiff's part," as she bears the burden of proving that she was disabled. *Karr*, 989 F.3d at 513.

Next, Plaintiff points out that unlike Dr. Glassenberg's opinion, PA Hereth's opinion purported to be retroactive to 2011. (Pl.'s Mem. at 15.) However, "a medical advisor's retrospective diagnosis may be considered only if corroborated by evidence contemporaneous with the period of eligibility." *McHenry*, 911 F.3d at 872 (internal citations and quotations omitted). In *McHenry*, the Seventh Circuit held that the ALJ should have considered a treating physician's retrospective diagnosis where the medical record from the relevant time period corroborated the retrospective opinion, and the claimant raised a "plausible argument" that a severe impairment discovered on an MRI was present three months earlier, before the relevant time period had ended. *Id*. Here, by contrast, Plaintiff cites to an "absence of evidence that [her] symptoms have worsened or improved" to support of her claim that there was "no reason to discredit" PA Hereth's opinion. (Pl.'s Mem. at 15.) But again, any "absence of evidence" "amounts to a failure of proof on Plaintiff's part," not a failure on the part of the ALJ. *Karr*, 989 F.3d at 513.

Moreover, the ALJ provided good reasons to discredit PA Hereth's opinion. First, she did not begin treating Plaintiff until more than one year after Plaintiff's DLI, and the ALJ found Plaintiff's mental impairment was controlled with conservative treatment during the relevant time period. This accords with *McHenry*, in which the Seventh Circuit affirmed the ALJ's decision not

16

to rely on a retrospective opinion as to the claimant's mental limitations because it came over one year after the DLI and there was little contemporary evidence to support that opinion. *McHenry*, 911 F.3d at 873. Second, contrary to Plaintiff's contentions, the ALJ was entitled to discount PA Hereth's opinion because she was not an "acceptable medical source." (Pl.'s Mem. at 15.) Although Plaintiff points out that PAs are considered acceptable medical sources in claims filed after March 27, 2017, Plaintiff filed her claim well before then, in October 2015, when PAs were not considered acceptable medical sources. *See* 20 C.F.R. § 404.1502 (an acceptable medical source includes "[a] Licensed Physician Assistant for impairments within his or her licensed scope of practice (*only with respect to claims filed (see § 404.614) on or after March 27, 2017*)" (emphasis added.) With regard to nonacceptable medical sources, "[a]n ALJ must minimally articulate its reasons for discounting non-treating sources' opinions but need not consider explicitly every factor listed under § 404.1527(c)." *Grotts*, 2022 WL 663274, at *3. The reasons articulated by the ALJ for discounting PA Hereth's opinion more than met this standard.

Finally, Plaintiff argues that the ALJ's decision to assign great weight to the opinions of the non-examining state agency mental health consultants was erroneous because: (1) it was not "valid" for the ALJ to give them deference based on their knowledge of the Social Security disability program and its evidentiary requirements; (2) the ALJ was wrong to find that "the non-examining opinions appeared reliable because Plaintiff's symptoms are well controlled, which they are not;" and (3) the ALJ assigned moderate limitations in ability to perform ADLs and social interactions while the state agency consultants opined Plaintiff had only mild limitation in these areas. (Pl.'s Mem. at 14-15.) None of these arguments provide a reason to remand the ALJ's opinion. First, contrary to Plaintiff's argument, the fact that state agency physicians are "highly qualified and experts in Social Security disability evaluation" is a valid reason to credit state

17

agency opinions. *See Grotts*, 2022 WL 663274, at \*3 (quoting 20 C.F.R. § 404.1513a(b)(1)). Second, Plaintiff's claim that the ALJ was wrong to find that her symptoms were well controlled seeks to have this Court reweigh the evidence considered by the ALJ, which we will not do. *See id.* (the Court does "not review medical opinions independently but rather review[s] the ALJ's weighing of those opinions for substantial evidence"). Third, the "ALJ has final responsibility for determining a claimant's residual functional capacity and need not adopt any one doctor's opinion." *Fanta v. Saul*, 848 F. App'x 655, 658 (7th Cir. 2021) (internal citations and quotations omitted). The ALJ was entitled to give great weight to the state agency opinions and accommodate Plaintiff's testimony that she "experience[d] some limitation in activity due to her physical and mental impairments during the period at issue." (R. 22.) Moreover, a "fundamental problem" with Plaintiff's argument for remand is that the ALJ assigned her greater limitations than the state agency consultants, *Gedatus*, 994 F.3d at 904, such that any error in the ALJ's assigning moderate rather than mild limitations was harmless because a finding of mild limitations would not change the ALJ's determination that she was not disabled during the relevant time period. *See Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) ("[a]n error is harmless if, upon examination of the record, the court can predict with great confidence what the result of remand will be"). Thus, the ALJ's assessment of the medical opinions was supported by substantial evidence. [14]

---

[14] Plaintiff references one more issue in a footnote, "noting that the ALJ's finding that Plaintiff's low back pain is not a medically determinable impairment is not supported." (Pl.'s Mem. at 1, citing evidence from April and July 2017.) The Court observes that the cited evidence is from well after the DLI and finds this argument waived because it is "[p]erfunctory[,] undeveloped," and "unsupported by legal authority." *Birch|Rea Partners, Inc. v. Regent Bank*, -- F.4th --, 2022 WL 611491, at \*3 (7th Cir. Mar. 2, 2022).

**CONCLUSION**

For the foregoing reasons, the Court denies Plaintiff's motion to remand (D.E. 15) and grants the Commissioner's motion to affirm (D.E. 17).


ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: April 1, 2022**

19